UNTIED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF:                                                    NO. 05-17400

SEA BRIDGE MARINE, INC.                                              Section "A"
    *Debtor*                                        Chapter 7

Claude C. Lightfoot, Jr., as Chapter 7
Trustee of the Bankruptcy Estate of
Sea Bridge Marine, Inc.
    *Complainant*

    VERSUS                                           ADV. NO. 07-01125

Amelia Maritime Services, Inc., et al.
    *Defendants*

**MEMORANDUM OPINION**

    The Chapter 7 Trustee, Claude C. Lightfoot, Jr. ("Trustee"), filed this adversary proceeding to avoid and recover three alleged preferential payments made by the debtor, Sea Bridge Marine, Inc., ("Sea Bridge" or "Debtor") to the defendant, Praxis Energy Agents, LLC, ("Praxis") totaling $195,000.00. Praxis asserts that the payments fall under the ordinary course of business exception set forth in 11 U.S.C. § 547(c)(2) and the subsequent new value defense of § 547(c)(4). On August 1, 2008, the Court conducted a trial and the parties were given until September 29, 2008, to file post-trial briefs.

**Jurisdiction**

    This Court has jurisdiction under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

**Facts**

Debtor was a marine cargo carrier and chartered vessels as a part of its business operations. Praxis is a bunker trader that supplies fuel to shipowners, charterers, and ship managers.[1] The parties began their business relationship in April, 2004, and Praxis sold Debtor twenty-one (21) bunkers from that time until Debtor filed bankruptcy on August 25, 2006. During the span of their business relationship, Sea Bridge made thirty-one (31) payments to Praxis; the last three being the subject of this adversary. The final three payments were: 1) a $100,000.00 wire transfer made on June 24, 2005; 2) a $25,000.00 wire transfer made on July 15, 2005; and 3) a $70,000.00 wire transfer made on August 5, 2005. The parties, in the Joint Pretrial Order, stipulated that the three payments in question satisfy the elements of 11 U.S.C. § 547(b), and barring any applicable defenses, are avoidable as preferential payments.[2] During the preference period, Praxis delivered one bunker of fuel to the M/V African Star in Mobile, Alabama, worth $50,593.75.

**Discussion**

Bankruptcy Code Section 547 allows a trustee to recover transfers or payments on an antecedent debt, made by the debtor within the ninety-day period preceding the filing of the bankruptcy petition. The Fifth Circuit explained the policy behind the preference provision:

---

[1] "Bunker" is an industry term for marine fuel. Bunkers are where ships used to store coal to be burned as fuel, and the term was carried over to describe fuel oil after coal became obsolete as a fuel. August 1, 2008, Trial Transcript ("Tr.T.") 20:19-21:3.

[2] The parties have stipulated that the disputed payments were made to Praxis on account of an antecedent debt owed by Sea Bridge before the transfer was made. They also stipulated that the payments were made while Debtor was insolvent, within the ninety days before the petition date, and that the payments enabled Praxis to receive more than it would have if the transfer had not been made and if it were to receive distribution under the provisions of title 11 of the United States Code.

> The theory is that when the preferential payments are returned, all creditors can share ratably in the debtors' assets, and the race to the courthouse, or the race to receive payment from a dwindling prebankruptcy estate, will be averted. Because some creditors, however, receive payments for shipping supplies that enable the debtor to continue doing business, to that extent they act to forestall an ultimate bankruptcy filing. Congress enacted several affirmative defenses against preference recovery in order to balance the competing interests.[3]

The only issues before the Court are the applicability of the defenses raised by Praxis.

A. Ordinary Course of Business Exception

Praxis asserts that the disputed payments were made in the ordinary course of business, and therefore may not be voided and recovered by the Trustee. Under the Bankruptcy Code, an otherwise preferential payment need not be returned to the debtor's estate if the transfer was:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.[4]

Praxis must prove all three statutory elements by a preponderance of the evidence.[5] The first element is not at issue as Sea Bridge incurred its debts to Praxis in the ordinary course of business; the purchase of fuel to supply its cargo transportation operations. The Trustee does not dispute this finding. The Court, therefore, turns to the remaining two elements.

---

[3] *In re SGSM Acquisition Co., LLC,* 439 F.3d 233, 238 (5th Cir. 2006).

[4] 11 U.S.C. § 527(c)(2). This statute was amended in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), however, the prior version of the statute is applicable in this case as Sea Bridge filed its bankruptcy before October 17, 2005; the effective date of BAPCPA. *See, In re SGSM Acquisition Co, LLC,* 439 F.3d 233, 237 n.1 (5th Cir. 2006).

[5] *Id.* at 239, *citing Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods)*, 296 F.3d 363, 367 (5th Cir. 2002).

<u>1. Were the transfers made according to the ordinary business affairs of the parties?</u>  The "subjective" prong of the ordinary course of business defense typically requires consideration of:

> (1) the length of time the parties were engaged in transactions prior to the preference period;
> (2) whether the amount or form of tender differed from past practices;
> (3) whether the creditor engaged in any unusual collection or payment activities prior to the transfers; and
> (4) the circumstances under which the transfers were made.[6]

The defense is narrowly construed[7] and a critical element in the analysis is whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent.[8]

**1. Length of Time.**  Before the preference period, Sea Bridge and Praxis conducted business between themselves for approximately 13 months. During this time, the parties completed seventeen bunker sales and Sea Bridge made twenty-eight payments on account. This pre-preference history provides the basis for comparison with the parties' preference period transactions.

**2. Payment Amounts and Form of Tender.**  Daniel Yasosky, General Manager of Praxis, testified that company policy required full payment of any invoice under $100,000.00, within 30 days of delivery. Praxis typically provided payment terms on invoices of $100,000.00 or greater.[9]

---

[6] *In re Sunset Sales, Inc.*, 220 B.R. 1005, 1020 - 21 (10th Cir. B.A.P. 1998), *see also, Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732, (9th Cir. 2994), *Logan v. Basic Dist. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 244 (6th Cir. 1992), and *In re Moltech Power Systems, Inc.*, 327 B.R. 675, 680 (Bankr. N.D.Fla. 2005).

[7] *In re Sunset Sales, Inc.*, 220 B.R. 1005, 1020 (10th Cir. B.A.P. 1998).

[8] *Official Plan Committee v. Expeditors International of Washington, Inc. (In re Gateway Corp.)*, 153 F.3d 915, 917 (8th Cir. 1998).

[9] Tr.T. at 61:21- 62:22. He also testified that the first couple of invoices allowed Sea Bridge 45 days to pay, but that policy was short-lived. The Joint Pretrial Order reflects that only the first invoice provided Sea Bridge with 45 days to pay.

Praxis charged interest on any invoice not paid within 30 days at the rate of two percent per month.[10]

The parties stipulated to the invoice dates, due dates, and delivery dates for twenty-one bunker sales to Sea Bridge. The parties also stipulated as to the amounts and dates of payment made by Sea Bridge to Praxis.[11]

Throughout 2004, and the early months of 2005, Sea Bridge purchased twenty bunkers of fuel ranging in price from $12,475.00 to $412,342.50. The bunkers purchased for less than $100,000.00 were invoiced and generally paid within thirty (30) days. Invoices over $100,000.00 were subject to prearranged installment payments on terms generally followed by Sea Bridge.

In early 2005, Sea Bridge began extending its time to repay. A February 28, 2005, invoice for $84,282.00 was not paid until May 4, 2005. A second invoice dated March 30, 2005, was not paid until May 19, 2005. Payments made during the pre-preference payment period matched the amounts due on specific outstanding invoices. In contrast, during the preference period, Sea Bridge made lump sum payments totaling $195,000.00, which did not match the outstanding invoices. These payments were the only times Sea Bridge forwarded payment to Praxis in amounts that did not correspond to the balance due on a specific invoice. At the time of the payments, multiple invoices were outstanding and Praxis applied the payments at will. This course of conduct varied considerably with the account's history before the preference period.

---

[10] Tr.T. at 33:11-20.

[11] The Joint Pretrial Order did not include three payments listed on the Sea Bridge account history, Exhibit 92, maintained by Praxis. The account history omitted an interest payment made on August 23, 2004 in the amount of $669.33, an interest payment made on September 2, 2004, in the amount of $671.01, and an installment payment made on December 6, 2004, in the amount of $116,778.90.

**3. Unusual Collection Activity**. The record contains evidence that the final three payments were made due to collection activities outside of the ordinary course of business. A string of emails admitted into evidence[12] shows that Praxis applied increasing pressure and demanded urgent attention as Sea Bridge's delinquency grew. In a June 23, 2005, email sent to Joseph Srour, General Manager for Sea Bridge, Daniel Yasosky stated: "[i]f a payment is not received today in the amount initially scheduled we will have no choice but to turn this matter over to our collections team as I (gen/mgr) have been unable to satisfy my board's guidelines." Sea Bridge made a $100,000.00 payment to Praxis the following day.

On July 29, 2005, Milto Papangelis, an attorney hired by Praxis, sent Sea Bridge a letter demanding payment on its outstanding debt as a "final pre-action warning."[13] He concluded the letter by threatening that Praxis would take "judicial steps against you/your assets in order to secure and enforce their undisputed and long outstanding claim..."[14]

Mr. Srour testified that towards the end of the first quarter of 2005 Sea Bridge was having cash flow problems.[15] As a result, he became the person within the company to negotiate with vendors for extensions of credit.[16] Cash was so tight that payments were only forwarded to vendors from whom additional services or goods were needed. This was a departure from the company's

---

[12] Exhibit 85.

[13] Exhibit 87.

[14] *Id.*

[15] Tr. T. at 158:8-18.

[16] Tr.T. at 160:5-11.

previous practices.[17] Bunker suppliers were some of the largest creditors of the company and Praxis was in the top six. Because they were important to operations, bunker suppliers were favored when payments on payables were made.[18] Sea Bridge believed that the greater the size of the payable, the more likely that a bunker supplier would take legal action.[19] When Praxis began making demands for payment on the past due account and threatened to seize the vessels[20] Sea Bridge took the threat seriously and made the payments in question.

Praxis' threat to turn Sea Bridge's account over to a collection team and the demand letter sent by Mr. Papangelis are evidence that it utilized collection activities to obtain the payment. The Court concludes that payments made in response to these demands were not in the ordinary course of business.

**4. Circumstances Under which Payments were Made.** As previously discussed, the $100,000.00 payment on June 15, 2005, was made after Praxis threatened collection or legal action.

The $25,000.00 payment, made on July 15, 2005, was a part of a payment plan proposed by Sea Bridge and agreed to by Praxis.[21] Under the terms of the repayment plan, Sea Bridge was to pay $25,000.00 per week. Sea Bridge made only one payment before breaching the terms of the agreement. This plan was the first of its kind between the parties. Payments made pursuant to a payment plan do not fall under the ordinary business exception where no such arrangements existed

---

[17] Tr. T. at 162:9-24

[18] Tr. T. at 163:23 - 164:17.

[19] Tr. T. at 164:21 - 165:1.

[20] Tr. T. at 166:8 - 167:16.

[21] Exhibit 85. July 13, 2005, email from Joseph Srour to Jenny Tsagli.

prior to the preference period.[22]

The $70,000.00 payment, made on August 5, 2005, was made in exchange for a delivery of additional fuel. Praxis agreed to supply a bunker of fuel, but only if Sea Bridge tendered $70,000.00.[23] Before this transaction, Praxis had never withheld delivery of a bunker for payment.[24] A debtor who makes payment in response to a cancellation of service cannot be deemed to have made the payment in the ordinary course of business.[25]

The three payments made during the preferential period were not made in the ordinary course of business. The amount and application of the final three payments differed from those made before the preference period. The circumstances under which the payments were made were unique to the preference period because they were made under threat of legal action, a repayment plan, or to obtain delivery of additional fuel. Therefore, the Court finds that payments made during the preference period are not consistent with those made prior to the preference period.[26]

2. Were the transfers made according to ordinary business terms? Often described as the objective prong of the ordinary course of business test,[27] the third prong compares the credit arrangements between other similarly situated debtors and creditors in the industry to determine if

---

[22] *In re Access Air, Inc.*, 314 B.R. 386, 394 (8th Cir. B.A.P. 2004)

[23] Tr.T. at 106:2-15.

[24] *See, e.g.*, Exhibit 85. May 31, 2005, email from Daniel Yasosky to Joseph Srour.

[25] *In re Access Air, Inc.,* at 393.

[26] Because the Court did not award any relief under Praxis' ordinary course of business defense, it need not consider whether Praxis is "double dipping" by benefitting from more than one preference defense. *See, SGSM Acquisition*, 439 F.3d at 243, n.7.

[27] *SGSM Acquisition* 439 F.3d at 239.

they are consistent with the payment practices at issue.[28] The Fifth Circuit determined that "the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue. Otherwise the practice cannot be considered an 'ordinary' way of dealing with debtors."[29] Furthermore, "for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product."[30]

Praxis failed to meet its burden under the third prong of the ordinary course of business exception because it did not produce sufficient objective evidence as to the prevailing credit arrangements between debtors and creditors within the marine fuel market. Praxis' only expert witness, J.C. Tuthill, a certified public accountant, was retained to determine whether the three payments that occurred during the preference period were made in accordance with industry practices. In preparing her report, Tuthill spoke with a representative of another bunkering company, audited the public financial statements of approximately ten shipping and bunkering companies, and reviewed wholesale trade information produced by Risk Management Associates.[31] Tuthill never worked in the maritime industry, nor did she review the financial statements of Sea Bridge. The Court accepted her as an expert witness in analyzing financial statements, but not in

---

[28] *Gulf City Seafoods,* 296 F.3d at 368.

[29] *Id.* at 369.

[30] *Id.*

[31] Tr.T. at 117:11-123:12. Risk Management Associates (RMA) publishes a report of operating statistics of companies that report to the RMA. The report provides information that would be found in a financial statement, such as operating expenses, cost of sale, revenues, and receivables that can be translated into day sales outstanding or days payable in payables. The RMA report does not break down payments by specific groups of clients and customers.

the maritime fuel supply industry.

Tuthill's analysis and expert report focused on the number of days it took Sea Bridge to pay Praxis on each invoice during and prior to the preference period. She then compared the number of days businesses in the maritime industry took to pay or collect receivables.[32]

Tuthill testified that other companies averaged between 44 and 135 days in days to pay, and between 29 and 89 days to collect receivables.[33] Tuthill only spoke with a representative of one company, and otherwise relied upon publically published year-end financial information. This information did not give her sufficient detail to determine the "days to pay" parameters for any of the companies in question. She also failed to obtain information on extensions of credit, repayment programs, or collection activities common within the industry. This one-dimensional analysis is not sufficient to establish the industry practice with regard to marine fuel supply credit arrangements.

As Praxis failed to establish a benchmark within the industry, the Court finds that Praxis has not met its burden of proof under the third prong of § 547(c)(2)(C). The Court will next consider Praxis' assertion that a portion of its payments are not preferential because it provided new value to Sea Bridge.

B, New Value Exception

Praxis argues that it provided subsequent new value to Sea Bridge within the preference period and is entitled to reduce the Trustee's recovery by the amount of the new value. Under § 547(c)(4), a trustee may not avoid an otherwise preferential payment to or for the benefit of a creditor, to the extent that, after such transfer, the creditor gave new value to the debtor -

---

[32] Tr.T. at 141:1-10.

[33] Tr.T. at 141:4-25, *see also,* Expert Witness Report, Exhibit 94.

-10-

> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

New value is defined in § 547(a)(1) of the Bankruptcy Code as:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

The purpose of this exception is to "encourage creditors to continue their revolving credit arrangements with financially troubled debtors, potentially helping the debtor avoid bankruptcy altogether."[34] Transfers that are protected under this section are "not unfair to the other creditors of the bankrupt debtor because the preferential payments are replenished by the preferred creditor's extensions of new value to the debtor."[35] The creditor must provide new value after it receives an otherwise preferential payment in order to qualify for the exception. The Fifth Circuit has rejected the "net result" rule that would allow a creditor to offset the total payments against the new value advances given during the preferential period.[36]

The transaction at issue revolves around a bunker delivery to the M/V African Star. Praxis agreed to sell Sea Bridge a $50,593.75 bunker for the ship on the condition that Sea Bridge make a $70,000.00 payment toward its outstanding debt. The payment and sale both occurred on August 5, 2005. Daniel Yasosky testified that Sea Bridge wired the payment and Praxis released the bunker

---

[34] *Matter of Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1091 (5th Cir. 1994).

[35] *Id.*

[36] *Id.* at 1092.

after it confirmed receipt of the funds.[37] This transaction falls within the new value exception because the bunker was not secured by an otherwise unavoidable security interest and Sea Bridge did not repay the new value by means of an otherwise unavoidable transfer.

The Trustee argues that Praxis should not be entitled to claim the new value exception because the M/V African Star's charter was cancelled shortly after the bunker was delivered. The Trustee asserts that the new value did not benefit the estate because Sea Bridge was not able to complete the voyage.[38]

Whether new value has been given is determined at the time goods are delivered to a debtor.[39] A supplier is not a guarantor of a debtor's success. In *In re Furr's Supermarkets*[40] the debtor returned expired baked goods, considered valueless at the time of return, to its creditor. The goods were worth approximately $90,000.00 when delivered to the debtor. The trustee attempted to reduce the amount of creditor's new value exception by arguing that the goods did not replenish the estate because the debtor did not sell the goods. The court disagreed and held that the creditor was entitled to a new value exception at their original delivery value. The defense applied because

---

[37] Tr.T. at 50:3-54:2 and Exhibits 51 and 80.

[38] The owner of the M/V African Star, Bremen Overseas Chartering and Shipping, gave Sea Bridge a $34,187.88 credit for the bunker that was on the ship, however the Trustee argues that the credit was of no value to the estate because the ship's owner offset the $34,187.88 against other outstanding debt. Tr.T 9:10-11:13 and Exhibit 93.

[39] *Rushton v. E & S Int'l Enters., Inc. (In re Eleva, Inc.)*, 235 B.R. 486, 489 (10th Cir. B.A.P. 1999); *In re Furr's Supermarkets, Inc.*, 317 B.R. 423, 428 (10th Cir B.A.P. 2004); *Excel Enters., Inc. v. Sikes, Gardes & Co. (In re Excel Enters., Inc.)*, 83 B.R. 427, 431 (Bankr. W.D.La. 1988).

[40] 317 B.R. 423 (10th Cir. B.A.P. 2004).

the goods were of value to the debtor when delivered.[41]

Since new value is calculated at the time Sea Bridge received the bunker, Praxis is entitled to retain the value of the bunker, or $50,593.75.[42]

**Conclusion**

Praxis has failed to demonstrate that the three payments made during the preference period fall within the ordinary course of business. The amount, application, and size of the payments differ from those made by Sea Bridge before the preference period. Additionally, the evidence and testimony show that Sea Bridge made the payments in response to unusual collection activities.

Praxis, however, has shown that Sea Bridge made the final $70,000.00 payment before Praxis provided new value in the form of a bunker valued at $50,593.75. Therefore, Praxis is entitled to a $50,593.75 exemption from the Trustee's preference claims. The Trustee is entitled to recover the remaining $144,406.25 in preferential payments made by Sea Bridge, plus legal interest from August 18, 2007.[43]

New Orleans, Louisiana, November 24, 2008.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[41] *Id.* at 429.

[42] The Court notes that the Trustee filed an adversary, case number 07-1124, against BOCS, seeking to recover preferences and fraudulent transfers. The adversary was resolved when, on April 14, 2008, this Court entered an Order Approving Compromise.

[43] The general rule is that interest is calculated from the date of demand for the return of the property, not from the date of the preferential transfer. *See, In re L&T Steel Fabricators, Inc.*, 102 B.R. 511, 520 (Bankr. M.D.La. 1989).